J-S30001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.L.O., MINOR CHILD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.L.O., SR., FATHER OF | : | |
| MINOR CHILD | : | No. 84 EDA 2015 |

Appeal from the Decree December 2, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000168-2014;
CP-51-DP-0001636-2012

BEFORE: GANTMAN, P.J., FORD ELLIOTT, P.J.E., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MAY 20, 2015**

Appellant, M.L.O., Sr. ("Father"), appeals from the decree entered in the Philadelphia County Court of Common Pleas, which granted the petition of Appellee, Philadelphia County Department of Human Services ("DHS"), for involuntary termination of Father's parental rights as to his minor child, M.L.O. ("Child"). We affirm.

The relevant facts and procedural history of this appeal are as follows.

> On September 5, 2012, [DHS] received a General Protective Service…Report stating that D.M. ("Mother") tested positive for benzodiazepines and marijuana at the time of [Child's] birth. Mother stated that she had taken a few puffs of marijuana for nausea and tested positive for benzodiazepines because she had taken a Percocet for pain after a recent root canal. However, Percocet is an opiate, not a benzodiazepine. The Report further stated that Father was allegedly stationed in Iraq.

\* \* \*

On September 7, 2012, DHS performed clearances for T.S., a maternal cousin, as a resource. DHS further learned that Father was not stationed in Iraq, but instead incarcerated in New Jersey. Father is currently incarcerated at Southern State Correctional Facility in Delmont, New Jersey after being convicted of certain persons not to have weapons, N.J.S.A. 2C:39-7(2), which states, "A person having been convicted in [New Jersey] or elsewhere of a disorderly persons involving domestic violence, whether or not armed with or having in his possession a weapon…who purchases, owns, possesses or controls a firearm is guilty of a crime of the third degree."

On September 10, 2012, DHS visited T.S.'s home and found it appropriate for [Child]. DHS obtained an [order of protective custody] for [Child] and placed him in the care of T.S.

At the Shelter Care Hearing held on September 12, 2012…, the [c]ourt lifted the [order of protective custody] and ordered the child's temporary commitment to DHS to stand.

*    *    *

At the Adjudicatory Hearing held on October 2, 2012…, the [c]ourt discharged the temporary commitment, adjudicated [Child] dependent and committed him to DHS. The [c]ourt found that Father was incarcerated. The [c]ourt further ordered Mother be referred to [the Clinical Evaluation Unit] for a…drug screen, assessment and monitoring. DHS was also ordered to arrange visitation for Father and explore family members as possible placement resources.

The Initial Family Service Plan ("FSP") Meeting was held on October 19, 2012, at which time the goal for the child was reunification. Only Mother participated in the Meeting.

*    *    *

At the Permanency Review Hearing held on November 16, 2012…, the [c]ourt found Mother achieved moderate compliance with the Permanency Plan, but the Permanency

- 2 -

> Plan did not apply to Father. The [c]ourt ordered supervised prison visits may be arranged for Father.
>
> At the Permanency Review Hearing held on February 7, 2013…, the [c]ourt found Mother had been fully compliant with the Permanency Plan, but compliance was not applicable to Father. The [c]ourt further ordered DHS continue to make efforts to set up visits with Father at the prison.
>
> An FSP Meeting was held on February 26, 2013, at which time the goal for the child remained reunification. Both Mother and Father did not participate in the Meeting. The FSP Objective for Father was to communicate with DHS and Delta Community Supports regarding the well-being of the child.[1]
>
> At the Permanency Review Hearing held on August 8, 2013…, the [c]ourt ordered DHS to make outreach efforts to Father.
>
> An FSP Meeting was held on September 27, 2013, at which time the goal for the child was changed to adoption. Father did not participate in the FSP Meeting. The FSP Objectives for Father remained unchanged.

(Trial Court Opinion, filed January 28, 2015, at 2-6) (internal citations to the record omitted).

On April 8, 2014, DHS filed a petition for involuntary termination of Mother and Father's parental rights. The court conducted termination hearings on September 11, 2014 and December 2, 2014. Immediately following the December 2, 2014 hearing, the court entered a final decree terminating Mother and Father's parental rights to Child. On December 29, 2014, Father timely filed a notice of appeal, which included a concise

---

[1] A caseworker from Delta Community Supports coordinated Father's supervised visits with Child. (**See** N.T. Hearing, 9/11/14, at 34-35.)

statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). Mother is not a party to the current appeal.

Father raises three issues for our review:

> WHETHER THE TRIAL COURT'S DECISION TERMINATING FATHER'S PARENTAL RIGHTS UNDER 23 PA.C.S.A. § 2511(a)(1) WAS SUPPORTED BY COMPETENT EVIDENCE.
>
> WHETHER THE TRIAL COURT'S DECISION TERMINATING FATHER'S PARENTAL RIGHTS UNDER 23 PA.C.S.A. § 2511(a)(2) WAS SUPPORTED BY COMPETENT EVIDENCE.
>
> WHETHER THE TRIAL COURT ERRED IN TERMINATING FATHER'S PARENTAL RIGHTS UNDER 23 PA.C.S.A. § 2511(a)(5) AND (a)(8) WHERE THE UNCONTROVERTED EVIDENCE ESTABLISHED THAT THE CHILD WAS REMOVED FROM MOTHER'S CUSTODY WHEN FATHER WAS INCARCERATED.

(Father's Brief at 5).

On appeal, Father asserts the court could not have terminated his parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(5) and (8), because those provisions do not apply to a natural parent who is incarcerated and does not have custody of the child. Regarding, Section 2511(a)(1), Father contends he established contact with Child's social workers in an effort to secure visitation and participate in planning for Child's future. Father avers he utilized all available resources to maintain a relationship with Child and perform parental duties while incarcerated. Father claims he visited with Child at the prison, sent cards and letters to Child, and completed a parenting class. Father argues "there is no factual basis in the record to terminate Father's parental rights on the theory that he abandoned…Child or

- 4 -

failed to exercise parental duties…." (Father's Brief at 15). Regarding Section 2511(a)(2), Father insists he provided the court with the exact date when New Jersey will release him from custody. Because he can assume full custody of Child within the next two (2) years, Father submits he can remedy the conditions that caused Child's placement. Father concludes the court erroneously terminated his parental rights. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*)*, appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of

grounds for doing so.

> ***In re Adoption of A.C.H.***, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. ***In re J.D.W.M.***, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

DHS sought the involuntary termination of Father's parental rights on the following grounds:

### § 2511. Grounds for involuntary termination

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

> **(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*    *    *

23 Pa.C.S.A. § 2511(a)(2); (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." ***In re Z.P., supra*** at 1117.[2]

> Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his…parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not

---

[2] DHS also sought the involuntary termination of Father's parental rights under Section 2511(a)(1), (5), and (8), but we need only analyze Section 2511(a)(2) for purposes of this appeal.

limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." **In re S.C.B.**, 990 A.2d 762, 771 (Pa.Super. 2010). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." **In re A.L.D.**, 797 A.2d 326, 340 (Pa.Super. 2002). The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in **In re Geiger**, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." **In Interest of Lilley**, 719 A.2d 327, 330 (Pa.Super. 1998). Additionally, incarceration "can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent….'" **In re Adoption of S.P.**, 616 Pa. 309, 332, 47 A.3d 817, 830 (2012).

Under Section 2511(b), the court must consider whether termination will best serve the child's needs and welfare. **In re C.P.**, 901 A.2d 516

(Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *Id.* at 520. The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated. *In re B.L.L.*, 787 A.2d 1007 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights

are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his…child.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations and quotation marks omitted).

"[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of his…potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, Father admitted he has been incarcerated since before Child's birth. Father applied for all parenting programs offered at his current prison, but he was eligible to participate in one program only. Father successfully completed the parenting program, and the certified record includes a copy of the certificate of completion. Father testified he has sent letters and cards "just to try to keep some kind of contact" with Child. (*See* N.T. Hearing at 11.) Father maintained contact with DHS to schedule visits with Child. Ultimately, Father received one supervised visit in June 2014 and a second supervised visit in August 2014. Father claimed, "The visits went great." (*Id.* at 13).

Regarding the duration of his current prison term, Father explained that his sentence expires on March 23, 2017, and it "wouldn't be possible" for him "to take full parental responsibility of" Child until that time. (***Id.*** at 20). Father is eligible for release to a halfway house in March 2015. While at the halfway house, Father would remain under the supervision of the New Jersey Department of Corrections. The halfway house, however, would allow Father to receive furloughs; and he could visit Child. Additionally, Child could visit Father on any day of the week at the halfway house; Father's current prison provides visitation on weekends only.

On cross-examination, Father detailed his criminal record, stating he was first incarcerated for the New Jersey offense in April 2012. Father admitted he had spent approximately eighty (80) days in solitary confinement during his current prison term, and he was not eligible for visits with Child while in solitary confinement. From 2005 until 2008, Father was incarcerated in Pennsylvania for a robbery conviction. Father also committed certain offenses as a juvenile.

Sandra Dubose, the DHS social worker, confirmed that Father maintained satisfactory contact with DHS. Child, however, shares a bond with his current caregiver, T.S.:

> He refers to her as mom. Initially, when I received the case he was really shy so every time when I go and visit he would run and hide behind her dress. He looks to her for his basic needs to be met and [they are] bonded. He's also bonded with her children as well.

(*Id.* at 26). Ms. Dubose concluded Child would not suffer irreparable harm if the court terminated Father's parental rights.

Kasheeda Boose, the caseworker from Delta Community Supports, supervised Father's visits with Child. Ms. Boose testified that Child was uncomfortable during the first visit, because T.S. did not remain with Child for the duration of the visit. Child "was looking at [F]ather trying to figure out who he was, but there really wasn't that much interaction." (*Id.* at 35). During the second visit, T.S. remained in the room with Child and Father. Although Child "was a little more playful" with Father, "he would still run to [T.S.] as his safety, as his comfort." (*Id.* at 35-36). Ms. Bose concluded there is no parental bond between Father and Child, but there is a parental bond between T.S. and Child.

Based upon the foregoing, the court concluded "Father has failed to remedy the conditions that brought the child into care and [he] will not be able to provide adequate care for the child in the foreseeable future." (*See* Trial Court Opinion at 8.) The court further concluded "there was not a strong bond between Father and his child, [and termination of] Father's parental rights would not cause the child irreparable harm…." (*Id.*) We accept the court's determinations.

Father would have Child remain in foster care limbo until after March 2017, when Father's current prison sentence expires. Father's parental rights cannot be "preserved by waiting for a more suitable or convenient

- 12 -

time to perform…parental responsibilities," especially where T.S. already provides for Child's physical and emotional needs.  ***See In re B., N.M., supra*** at 855.  ***See also In re D.C.D.***, ___ Pa. ___, 105 A.3d 662 (2014) (holding court did not abuse its discretion in determining father was incapable of providing care for child, and incapacity would exist at least until father's minimum release date of 2018 when child would be seven years old; child had strong bond with foster family, with whom she had lived nearly all her life); ***In re Adoption of S.P., supra*** (explaining that even upon parole, Father would reside in halfway house and would eventually need to obtain housing, employment, and transportation in addition to parenting skills; court did not abuse its discretion in concluding that Father could not remedy conditions and causes of incapacity).  Thus, the record supports the court's conclusion that Father cannot provide the irreducible minimum parental care for Child and termination of Father's parental rights was in Child's best interests.  ***See In re Z.P., supra***; ***In re B.L.L., supra***.  Accordingly, we affirm.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/20/2015

- 13 -